## RUBYETTE CO. v. VINELAND PRODUCTS CO.

District Court D. New Jersey.
March 24, 1931.

Louis Rudner, of Trenton, N. J., of counsel (Chas. E. Townsend, of San Francisco, Cal., and Edward L. Katzenbach, of Trenton, N. J.), for plaintiff.

Hervey S. Moore, of Trenton, N. J. (Munn, Anderson & Munn, and T. Hart Anderson, all of New York City, of counsel), for defendant.

CLARK, District Judge.

The principal case gives some evidence, at least, that all the products of the California vineyards are not used in accordance with the terms of section 29 of title 2 of the National Prohibition Act (27 USCA § 46). The litigation is twofold: Trade-mark and/or trade-name, with its usual concomitant unfair competition, and under a patent for the process used in preparing the product to which the name has been given. This product is a dried and skinless grape put up in small jars or bottles and artificially colored. We understand that these grapes are intended more for garnishment than for nourishment.

To this finished article the plaintiff company has applied the names "Graettes": "Rubyette," "Emrellette," etc.; the prefixes being related to the particular artificial coloring used. Such application has been adequately protected by trade-mark registration. The defendant company, by concession, is also selling dried and skinless grapes put up in small jars or bottles and artificially colored. The trade-mark which they have chosen and registered is "Decorettes." The court does not feel that the guise and garb of their merchandise is such that any imitation in an invidious sense is intended. The very nature of the product makes for similarity and for difficulty in differentiation.

An examination of the cases wherein either the registration of a name as a trade-mark or an injunction against the use of such name is sought leaves the court with an impression of judicial timidity. These cases are to be found collected in USCA, title 15, under section 85, note 32 and section 99, notes 10 to 13, and also in the Federal Digest, volume 14, section 59, subsection 5. Manifestly the selection of a fancy or arbitrary trade-mark is limited only by phonetics and the imagination of the chooser. Unless, therefore, it appears that his particular selection is a result of coincidence and has been followed by the growth of a valuable business, based thereon, we can see no reason for an attitude of strict construction. Judge Learned Hand (nomen clarum), then sitting in the District Court for the Southern District of New York, put the matter, with his usual penetration to essentials, in the case of Lambert Pharmacal Co. v. Bolton Chemical Corporation, 219 F. 325 (D. C. 1915). He said at page 326 of 219 F.: "In choosing an arbitrary trade-name, there was no reason whatever why they should have selected one which bore so much resemblance to the plaintiff's; and in such cases any possible doubt of the likelihood of damage should be resolved in favor of the plaintiff. Of course, the burden of proof always rests upon the moving party, but having shown the adoption of a similar trade name, arbitrary in character, I cannot see why speculation as to the chance that it will cause confusion should be at the expense

of the man first in the field. He has the right to insist that others in making up their arbitrary names should so certainly keep away from his customers as to raise no question." This court expressed somewhat similar views at the time of the trial. It gathered then that the defendant company did not insist very earnestly upon its use of the word "Decorettes," and that this branch of the case is being formally rather than substantially presented.

Although the patent phase of the litigation was, on the other hand, ably and thoroughly briefed and argued, the defendant company seemed to the court to emphasize the less fundamental issues. It contented itself with a formal denial of validity and introduced in evidence only the prior art patents cited as references in the file wrapper. If this course was adopted as a manner of court strategy, we feel that it is a mistaken one. The plaintiff company sells on a national scale, and it is not unlikely that another infringement either has or will occur in another circuit. The view of this court and of this circuit might, therefore, receive final approval or disapproval in the Supreme Court of the United States—a consummation devoutly to be wished for, and the lack of which has given rise to serious complaint against the procedural part of our patent system.

The patent in suit, No. 1,721,929, dated July 23, 1929, claims a process for peeling fruits. Two claims are set forth as typical and an accurate description thereof.

"1. A process for peeling fruits consisting of immersing the fruit in hot soda water, then wilting the fruit, then placing it in a lye bath, and then washing the lye therefrom."

"5. A process for peeling fruits having tough skins, such as grapes and plums, consisting of scalding the skins of the fruit until the skins thereon are softened and porous, then permitting the fruit to wilt and then subjecting the skins to the action of lye."

This court is somewhat reluctant to refer again to the proceedings in the Patent Office, as it does not wish its heretofore expressed views to assume the appearance of an obsession. The file wrapper in this case is, however, so significant that a statement of its contents cannot be avoided. The application was forwarded on June 8, 1926. On September 2d thereafter reference was made by the Patent Office Examiner to the patents to Judge (No. 850,655, April 16, 1907), to Thompson (No. 1,389,796, September 6, 1921), to Moore (No. 1,518,537, December 9, 1924) and to Pyle (No. 1,444,386, February 6, 1923). All of these patents are process patents, and three of them relate to removing the skin of fruits and/or vegetables. The method of the earliest to Judge (April 16, 1907) consisted in the subjection of the fruit to a caustic soda or other skin disintegrating solution followed by spraying to remove the loosened skin and then a steam bath for washing and blanching. The patent to Thompson (September 6, 1921) called for an initial softening of the skin by heat and its subsequent removal in an "aqueous saline solution." Last of the three, the patent to Pyle (February 6, 1923) shows a succession of lye baths, each one followed by washing. The patent to Moore (December 9, 1924) is, on the other hand, for drying rather than peeling fruit, and calls for submerging in an alkaline solution in order that the skin may more entirely exude moisture during the subsequent drying process. The Patent Examiner suspended final judgment on the application pending the disclosure of the concentration of the preliminary skin softening bath.

On May 21, 1927, applicant's solicitor submitted some unsubstantial amendments and an argument with respect to the Judge patent which attempted to distinguish between peaches, apricots, pears, and grapes and plums and stated that the patent did not disclose any wilting of the skins.

On November 10, 1927, a different Examiner responded to the amendment and argument citing two additional references, Monte (No. 858,095, June 25, 1907) and Pearson (No. 1,401,437, December 27, 1921). Continuing our description of the cited references, Monte is for a process of peeling fruits and/or vegetables. Although only three months subsequent, it is certainly very similar to that of Judge. It provides for the subjection of the fruit and/or vegetable to a bath "in a disintegrating solution for the purpose of loosening and breaking the skin and then its passage into the range of action of hydraulic sprays for the removal of the same." The patent to Pearson (December 27, 1921) differs from those heretofore cited in that it is for a product, i. e., a dipping apparatus. The nub of its anticipation as far as the plaintiff's patent is concerned appears in the following quotation from the specifications: "The apparatus is particularly adapted to dipping bunches of grapes, prior to drying, but it is to be understood that it is equally applicable to all articles which require dipping in a bath or solution. The rapid and economical drying of grapes by artificial heat requires that the grapes be dipped in a lye bath, to partially disintegrate the skins prior to being placed in the drying chamber." The Patent Examiner summarizes these references and rejects the application in the follow-

ing language: "Claims 1, 3, 4, 5, 8, are rejected as met by Judge or Monte in view of Pearson. It is held that to apply a peeling process such as is pertinently described in Judge and Monte to the fruit prepared by the Pearson process does not constitute invention."

By letter of December 29, 1927, applicant requests reconsideration by the Examiner of his rejection previously referred to. As his argument is substantially that presented in this court, we feel justified in quoting him in part: "These claims all include the limitation of wilting or drying the fruit prior to its treatment in the lye or skin removing solution and it is this feature which differentiates the applicant's present invention over the prior art and which makes it possible to produce the product which he is now making in accordance with this process, the product being a grape in substantially its normal condition with the skin removed." This argument seems to have been persuasive, for on May 7, 1928, we find the Examiner allowing the claims chiefly insisted upon. In reply to this good news, applicant's attorneys made the mistake of suggesting a minor amendment, and in doing so apparently allowed the Patent Office opportunity for further search, for in the letter of May 25, 1928, we find the following:

"Additional reference made of record:
Dunkley 1,655,690 Jan. 10, 1928 146/219

"The examiner regrets that the above reference has not previously been cited. Claims 3, 4, 5 are rejected as fully met thereby."

This last Senagambian in the Patent Office files was again a process for peeling fruits and/or vegetables. It indicated that the torch of Judge and Monte was being carried on. It provided a process for peeling fruits, etc., by subjecting their surface to hot caustic soda solution, the combination to heat, and subsequently subjecting the surface again to hot caustic soda solution. (It should be noted that the claims actually allowed in this last communication seemed unsatisfactory, and therefore we assume did not in the applicant's opinion embody the invention).

After taking the summer to think the matter over, the applicant replied on September 7, 1928, with an elaborate contention in refutation of this unexpected action by the Patent Office. He again attempted to distinguish between the hard and soft pulp fruits and/or vegetables, and emphasized the wilting which intervened between the first and second dippings of his patent. It took nine months (September 7th to May 20th) for it to bear fruit, but its final flowering, to mix the metaphor, the grant of a patent on May 20, 1929,

or three years after the first application, must have been most satisfactory to the persistent and still alleged inventor. In this, as in the other cases we have examined, the final allowance of the patent does not deign to state any reason for the sudden change of mind on the part of the Patent Office. The court, and incidentally the public, is thus left with a series of excellent arguments why the patent should not be granted and the stark fact that it has been granted.

The only other prior art patent offered by the defendant is one No. 1,544,282, dated June 30, 1925, to the alleged inventor (Otto J. Steinwand) of the principal case. This indicates that he had interested himself in the art two years prior to his first application for the principal patent. The defendant offers this both as anticipation and as evidence with respect to his contention of unclean hands to be dealt with later. The process there is for a fruit butter or jam, and consists in the dipping of fruits first in warm water and then in a lye solution. Not even a second thought seems to have produced this patent "in the office." It would be interesting to examine the course of its proceedings therein.

The reasoning of the Patent Office Examiners in their tentative rejection of the patent of the principal case has quite convinced this court of its invalidity by reason of prior anticipation. Our mind has not been changed, as the Patent Office Examiners' apparently was by the rebuttal of the plaintiff's solicitor, which we may say seems to have been in substantially the same terms as that previously considered by the Examiner. We cannot grasp the patentable distinction between the artificial heating of the Dunkley patent and the natural or solar heating, called wilting, of the Steinwand patent. Furthermore, in view of the admittedly old process of removing the skin from fruits by alkaline baths and the also scriptural age of raisins (or wilted grapes), we do not feel that the second Steinwand process is invention, even in the absence of some or all the anticipating patents.

At the argument (Record, p. 38) we were kindly furnished with a citation to the case (in this circuit) of Brogdex Co. v. American Fruit Growers, Inc. (D. C.) 21 F.(2d) page 110; Id., 35 F.(2d) page 106 (1929 C. C. A.). The patent there involved was for a process for preventing the decay in citrous fruits by washing them in a borax solution. Counsel stated, and we think correctly, that this case was pertinent to and might even be controlling of the issue in the principal case. Fortunately for the peace of mind of this court, and unfortunately for the plaintiff, the Brogdex Case has been reversed by an opinion

handed down by the Supreme Court of the United States within the month. American Fruit Growers, Inc., v. Brogdex Co., 51 S. Ct. 328, 75 L. Ed. ——. It is curious to note that the anticipating patent set forth at some length in Mr. Justice McReynolds' opinion is not mentioned in the opinions of either of the lower courts.

As heretofore indicated, the defendant principally relied on the defenses of unclean hands and noninfringement. The legal facets of these wide general subjects were both interesting and interestingly presented. In view of our decision of validity, it is unnecessary to rule upon them definitely. As a higher court may take a different view on the question of validity, we, however, suggest them briefly.

■ The "grimy," so to speak, conduct with which the plaintiff is charged consisted in falsely marking his product. The conceded fact is that the bottles of "Rubyettes," etc., have on them a circular neck band bearing the legend "Patent No. 1,544,282, other patents pending." The patent referred to will be recognized from the body of this opinion. It was the earlier patent to Steinwand for a fruit butter, jam, or filler, and, of course, had absolutely no reference to the patent in suit. As soon as this marking was brought to the attention of distinguished counsel who argued this case, it was, of course, removed. He seemed to us to argue that, because it was removed upon his most excellent advice, therefore, its previous appearance before his advice was taken was innocent. Or in other words, from the ability of the advisers followed the necessity for the advice. It occurs to the court that, rather than this deduction, that of the gnat and the camel is appropriate. The first Steinwand patent is for a jellied mass, and we do not feel that any very profound consultation was needed to assist the plaintiff in distinguishing between such jellied mass and the wilted grapes of their subsequent product.

The cases in this narrow branch of the "clean hands" doctrine show a tendency to emphasize the effect of the reprehensible conduct on the public. As the doctrine is based on the personal standing of the particular plaintiff to call upon a court of grace and mercy, we cannot quite see how the outward effect of his conduct is pertinent. The test seems to us subjective and not objective, and our interest in the heart of the plaintiff rather than in the stomachs of his customers. As a matter of fact, we cannot imagine anything more calculated to deceive the public than the unwarranted assertion that a product was patented or the result of a patented process. Furthermore, the argument that the public is not deceived seems to depend on the assumption that its individual members would, upon seeing the label, send to the Patent Office for the patent indicated there, and, upon comparing it with their pantry shelf, learn the bitter truth. If that is their duty, we have a new field for the operation of consumers' leagues.

■ The defendant finally contends that his process does not infringe that of the plaintiff because it does not duplicate every step therein. It is agreed that defendant purchases the product known as "Thompson's Bleached Seedless Raisins" in the open market and then subjects the said raisins to a lye bath. In other words, the defendant buys a wilted grape and removes the skin by the time-honored use of an alkaline solution. On simple principles of the law of property we think plaintiff's action quare fregum clausit (called infringement in the realm of mental property) fails. He owns a process for wilting and treating grapes with lye. He does not own a process for treating wilted grapes with lye. The knowledge of grape wilting might be a reason for not granting a patent for the combination of wilting and bathing. It is certainly not one for enjoining those who take advantage of that prior knowledge as a step in their process. To say otherwise would, it seems to us, be the issuance of a patent in the form of an injunction.

Settle decree upon motion.